IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 17, 2024

## STATE OF TENNESSEE v. ROBERT DAVID MORSE

**Appeal from the Criminal Court for Cumberland County**
**No. 20-CR-280    Gary S. McKenzie, Judge**

**No. E2024-00580-CCA-R3-CD**

FILED

FEB 0 5 2025

Clerk of the Appellate Courts
REc'd By_____

A Cumberland County jury convicted the Defendant, Robert David Morse, of first degree premeditated murder, and the trial court sentenced him to life in prison. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that the trial court committed two evidentiary errors: (1) admitting multiple autopsy photographs depicting the victim's body; and (2) limiting his cross-examination of Agent Davenport about the Defendant's statement to the police. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which J. ROSS DYER, J., and D. KELLY THOMAS, JR., S.J., joined.

Michael R. Giaimo, Cookeville, Tennessee (on appeal), Randal R. Boston and Jeffrey Vires, Crossville, Tennessee (at trial), for the appellant, Robert David Morse.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip Hatch and Allison Null, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from the shooting death of Matthew Dylan Musser, which occurred in September 2020. For this killing, a Cumberland County grand jury indicted the Defendant for premeditated first degree murder.

## A. Pretrial

Before trial, the Defendant filed a motion to exclude crime scene autopsy photographs. During a pretrial hearing, the parties argued the matter. The State offered that it would like to introduce twenty-seven autopsy photographs. The Defendant objected on Tennessee Rule of Evidence 403 grounds, that their prejudicial value substantially outweighs any probative value. The Defendant's counsel noted that the photographs were in color, which enhanced some of the gruesomeness of the photographs. He asked that they be offered as black and white photographs. The Defendant's counsel noted that some of the pictures were unnecessarily offensive or redundant. The Defendant's counsel noted that there were other photographs that were not as offensive, and he did not object to those. In the less offensive photographs, the blood had been cleaned off the body.

The State countered that the photographs were necessary and that the probative value outweighed prejudicial effect. It noted that some of the pictures to which the Defendant objected showed the exit wound on the victim's chin with fibers, which the State argued would support its theory that the victim was in bed covered by his comforter when shot.

The trial court went through each of the pictures with the parties. Based upon appropriate considerations, it ultimately excluded all but two of the crime scene photographs that included the victim's body.

## B. Trial

During the trial, the parties presented the following evidence: Tanner Isham testified that, at the time of the shooting, his father owned the house on Doris Drive where the victim was killed. Mr. Isham and the victim lived at the Doris Drive house together for years, and, for some duration, they had another roommate named Braden Underwood.[1] After Mr. Isham and the victim had lived in the house for two years, Mr. Isham's friend, the Defendant, also moved in. The Defendant moved out a few months before the murder, but he would still frequently visit Mr. Isham and the victim. When they hung out, there were often others present, including the Defendant's girlfriend, Tekia Tuttle. It was not unusual for the Defendant to be armed, but, once Mr. Isham received a probationary sentence for a drug-related offense, the men were careful not to bring firearms to the house.

---

[1]Mr. Isham is uncertain whether Braden's last name is Underwood or Atwood. For clarity, we will refer to him as Braden Underwood.

2

Around the time of the shooting, Mr. Isham suspected that Ms. Tuttle and the victim had begun a sexual relationship. Ms. Tuttle was at the Doris Drive home on September 26, 2020, the day of the shooting, "laying around" with the victim. Mr. Isham sent the Defendant a message via SnapChat, telling him that he should come over to their house. He said his intention was for the Defendant to find out for himself that Ms. Tuttle and the victim were in a romantic relationship.

When the Defendant arrived, Mr. Isham was in his room with Alisa Mercer, Mr. Underwood, and Ms. Tuttle. The victim was in his bedroom. The Defendant, who appeared calm, asked if it was true that Ms. Tuttle was in a sexual relationship with the victim. The Defendant appeared to be asking without knowledge about the relationship.

At some point, the Defendant and Ms. Tuttle left the room, and Mr. Isham saw them walk down the hallway past the victim's room. Mr. Isham heard their raised voices after they left the room. About five to ten minutes after they left his room, Mr. Isham heard multiple gunshots. Mr. Isham went toward the sound, and he saw the Defendant in the victim's bedroom holding a gun. He also saw that the victim had been shot. The victim was still "barely" alive and attempting to breathe. Mr. Isham grabbed the gun from the Defendant so he could not shoot anymore, and he threw the gun into the hallway. Mr. Isham asked the Defendant, "why," and the Defendant responded that he was sorry.

Someone had called 911, and first responders arrived. Mr. Isham retrieved towels for the responders while the Defendant went to the kitchen and sat down. The Defendant then went outside.

Several law enforcement officers testified at trial. Mitchell Ward, a corporal with the Cumberland County Sheriff's Department, responded to the 911 call about this shooting. When he arrived at the Doris Drive house, there were two women and the Defendant in the yard. The Defendant, who appeared calm, was sitting beside the front steps in the yard, near the front porch. Also in the yard there was a bicycle. As Deputy Ward approached, the Defendant stood and placed his hands behind his back. When the deputy asked what happened, the Defendant said that he had just shot someone. The deputy placed the Defendant in handcuffs and asked the whereabouts of the gun, which the Defendant said was inside the house in the hallway. Deputy Ward took the Defendant, who seemed scared but calm, to his patrol vehicle.

Four other deputies arrived shortly after Deputy Ward, and they went into the house as Deputy Ward spoke with the Defendant. After Deputy Ward secured the Defendant in his vehicle, he went inside the house with the other officers. There, he saw two "frantic,

3

very upset" individuals. EMS was also present and determined that the victim was deceased.

Tennessee Bureau of Investigation Agents Brandon Davenport and Steven Webb both investigated this case. Agent Davenport was in charge of the investigation and responded to the shooting scene. There, deputies informed him that the Defendant had identified himself as the shooter. Agent Davenport tasked Agent Webb with processing the crime scene, but he did a preliminary walk-through of the scene in advance of interviewing the Defendant. He then went to interview the Defendant.

Agent Webb assisted in processing the crime scene. The agent offered twenty-nine pictures of the crime scene, including pictures of the exterior and interior of the house, the bicycle, a gun in the hallway, a view of the gun showing it was loaded, a Florida Gators backpack, and other items found at the scene. Agent Webb identified the gun as a Taurus .45 semiautomatic weapon. Agent Webb then offered, and the trial court admitted, a series of photographs of the victim's room. Those photographs showed the bed where the victim was located when shot, multiple photographs of his body, showing five gunshot wounds, and photographs of the shell casings, one of which was behind a couch in the victim's bedroom. The agent said that no weapons were found in the room and that all the shell casings appeared to match the caliber of the weapon in the hallway. Fibers embedded into the victim's body led Agent Webb to conclude that some of the projectiles passed through the comforter or a pillow before entering the victim's body.

Agent Webb noted that bullets had gone through the wall in the victim's bedroom, and he followed them to the ensuite bathroom connected to Mr. Isham's bedroom. He also photographed these projectiles.

During cross-examination, Agent Webb said that there were seven projectiles fired and three remaining in the weapon. During further redirect examination, the agent recounted that officers believed that the one remaining projectile had hit a stud inside the wall and presumably fallen down, and they chose not to retrieve it.

Agent Davenport identified some of the photographs, and he noted that during his interview the Defendant told him that he brought the gun to the scene in a blue Florida gators bag, which was depicted in Agent Webb's crime scene photos. The handgun in the picture was a Chivalrous .45 caliber handgun.

Agent Davenport interviewed the Defendant. The Defendant recounted that he and his girlfriend, Ms. Tuttle, were having issues in their relationship. One of those issues involved the victim. The Defendant told Ms. Tuttle by text that he did not want her going

4

to the victim's house because he thought the victim "liked" Ms. Tuttle. Due to their issues, Ms. Tuttle moved out of their joint residence a day before the shooting, and someone informed the Defendant that, on September 25, 2020, the day before the shooting, Ms. Tuttle slept overnight in bed with the victim. He believed them to be engaged in a sexual relationship.

The Defendant received a message from Mr. Underwood on September 26, 2020, informing him that the victim and Ms. Tuttle were at the Doris Drive house. The messages said that they had been kissing and "cuddling" and were behind closed doors together. Upon receiving these messages, the Defendant sat on his bedroom floor and cried. When he finished crying, he walked over to his gun drawer, opened it, and removed the handgun he kept there. He put the gun into the Florida Gators bag, placed it on his back, and biked 3.5 miles to the Doris Drive house, which took between twenty and twenty-five minutes.

The Defendant entered the home, dropped his bag, and went to Mr. Isham's room, where he saw Ms. Tuttle. He asked to speak to her privately. The two went to a garage and continued speaking. Shortly thereafter, the Defendant went to the living room and retrieved his gun and went to the victim's bedroom. He found the victim lying on the bed, head on his pillow. The Defendant thought the victim was feigning sleep, so he started to hit him with his gun in a "pistol whip" fashion. The victim awoke and attempted to block himself from being hit. The Defendant pulled the gun away, stepped back, and fired it at the victim three to four times. The victim pulled back the comforter, and the Defendant saw that the victim had three gunshot wounds, one in the neck area and two to the chest. He did not think that the victim would survive those gunshot wounds and did not want him to be in pain, so he shot him again multiple times. He then sat down on the couch in the room and fired at the victim one last time.

The Defendant said he was familiar with firearms, had shot a gun before, and had some knowledge of handguns. The Defendant said he owned a Taurus .45 caliber handgun. He purchased the gun to protect his home and his family, and when discussing shooting the victim, he said "I guess that's what I thought I was doing here," meaning protecting his family.

A firearms expert, TBI Agent Savannah Houk, examined the firearms evidence in this case: a firearm, a magazine, three cartridges, three cartridge cases, and five bullets. She determined that the cartridge cases and bullets that were received were all fired from the firearm that was submitted in this case. The firearm itself, and magazine, functioned properly. During examination by the defense, Agent Houk recounted that this was a double action firearm. All the bullets were hollow points and most were 230 grain.

The medical examiner who performed an autopsy of the victim's body, Miguel Laboy, determined that the victim died of multiple gunshot wounds, five in total. A toxicology report showed that he was positive for cannabinoids, meaning he had used marijuana sometime before his death. Dr. Laboy identified multiple photographs taken as part of the autopsy. Some of the pictures showed fibers that the doctor had collected from the victim's chin and chest wounds. Dr. Laboy described the wound tracks of the bullets in more detail and the resulting damage of each bullet. He recovered four bullets from the victim's body.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder. The trial court sentenced him to life in prison.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that the trial court committed two evidentiary errors: (1) that it admitted multiple autopsy photographs depicting the victim's body; and (2) that it limited his cross-examination of Agent Davenport about the Defendant's statement to police.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for first degree murder because it was insufficient to prove that he acted with premeditation. He notes that he first attempted to search for a heavy object with which to attack the victim, upon not finding one, he chose to first "pistol whip" the victim. He asserts that this proves he did not want to kill the victim. He further argues that the initial shots were in rapid succession and that he only fired the second round of shots because he did not want the victim to suffer. This, he says, proves he was acting under extreme passion and extreme excitement. The State disagrees, stating that the proof overwhelmingly establishes guilt. We agree.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a

6

criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is "[a] premeditated and intentional killing of another [.]" T.C.A. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as:

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). As previously discussed, our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. *Jackson*, 173 S.W.3d at 409; *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *Leach*, 148 S.W.3d 42, 54 (Tenn. 2004); *Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *Bland*, 958 S.W.2d at 660. In addition, a jury may consider "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d at 302; *see State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and Ms. Tuttle broke up the day before the shooting. The Defendant's friend informed him that Ms. Tuttle was at the Doris Drive house with the victim and that the two were acting romantically towards each other. Upon hearing the news, the Defendant cried. He then loaded his gun into a bag, got onto a bicycle, and rode twenty to twenty-five minutes to the house. He went into the home, saw Ms. Tuttle, who was not with the victim at that time, and asked to speak with her. The two had a brief conversation, and the Defendant looked for a heavy object with which to attack the victim. Upon not finding

8

one, he attacked the Defendant, who was sleeping in his bed, with the gun. He then shot him three times in rapid succession. Upon seeing the victim's wounds and determining they were likely not survivable, he saw fit to execute the victim by firing at him two or three more times. He then sat down on a couch in the room and fired upon the victim one more time. The Defendant did not attempt to render aid or call for police, and he remained calmly at the scene until law enforcement officers arrived. He informed them that he had killed the victim.

This evidence supports the jury's conclusion that the Defendant acted with premeditation. The Defendant knew the victim and had a clear motive for killing him. He packed a gun to take with him to the scene, was calm at the scene before and after the killing, and shot at the victim multiple times, who was both unarmed and sleeping in his bed. Further, the Defendant clearly stated that, after determining that the victim was in pain, he saw fit to continue to shoot at the victim to end his pain. This was an active thought after exercise of reflection. Considering these factors, and the nature of the killing, we conclude that the evidence supports the jury's verdict. The Defendant is not entitled to relief on this issue.

## B. Evidentiary Rulings

The Defendant next contends that the trial court committed two errors regarding the admission of evidence. He first asserts that the trial court improperly prohibited him from exploring the voluntariness of his confession. He also contends that the trial court erred when it admitted multiple photographs of Mr. Musser's body.

We generally review evidentiary rulings under an "abuse of discretion" standard. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Clark*, 452 S.W.3d 268, 287-88 (Tenn. 2014); *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

### 1. Cross-Examination

The State offered the Defendant's video recorded confession at trial in its entirety without objection, and then it highlighted clips for the jury through lead investigator Agent Davenport. The Defendant then began to cross-examine Agent Davenport about the voluntariness of the Defendant's conviction. The State objected on grounds of relevance first and began offering additional grounds for objection, but the trial court ruled no additional grounds were necessary and sustained the State's objection. On appeal, the Defendant acknowledges that he lost the opportunity to challenge the admissibility of his

confession by failing to file a pretrial challenge but argued that he still should have been allowed to call the statement into question before the jury by challenging the voluntariness of the statement. The State, importantly, cites to the record about what actually occurred during the trial, which reframes the objection and trial court's ruling.

During trial, the following occurred:

> [Defense Counsel]: Okay. So I'm curious, too, we didn't replay the part [the videotaped confession] where you actually did not read the rights to my client. You had him read them?
>
> [Agent Davenport]: Yes, sir.
>
> [Defense Counsel]: After the interview is when you read him his rights?
>
> [Agent Davenport]: Mr. Morse indicated that he understood his rights. I provided him the opportunity to read those. He made multiple verbal indications that he wished to speak. Later on, whenever I went to obtain consent for the cell phone, I referenced back, to ensure that he still understood his rights, as he was providing me an additional consent to search.
>
> [Defense Counsel]: You didn't read him his rights until after he was questioned? That was my question.
>
> [Agent Davenport]: I did not read them until I confirmed. I provided the opportunity for [the Defendant] to read the rights he indicated that he understood, and he signed saying that he understood those rights. And he made indication that he had knowledge of those rights, as what his rights were.
>
> [Defense Counsel]: Who doesn't?
>
> [Agent Davenport]: I'm sorry, sir? Could you repeat?
>
> [Defense Counsel]: Everybody knows; right?
>
> GEN HATCH: Your Honor –
>
> [Agent Davenport]: Are you saying that everyone . . .

10

[Defense Counsel]: It is the policy of the Tennessee Bureau . . .

THE COURT: Hold on. Is there an objection?

GEN HATCH: Number one would be relevance. And number two . . .

THE COURT: Sustained to relevance. I don't need the number two. Sustained to relevance. What everybody knows about their rights is not relevant to this case. We're talking about this individual. So that's sustained.

All right, continue with your questioning.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). The propriety, scope, manner and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463.

Considering what occurred at trial, we conclude that the trial court did not abuse its discretion when it sustained an objection based on relevance as to whether "everybody" knew their rights pursuant to *Miranda*. The trial court clearly limited the ruling, articulated that limitation to defense counsel, and encouraged defense counsel to continue with his questioning. The Defendant's framing of this issue as a ruling limiting his ability to explore the voluntariness of his confession is inaccurate. He is not entitled to relief on this issue.

### 2. Crime Scene Photographs

The Defendant contends that the trial court erred when it admitted photographs from the crime scene because the photos were especially gruesome. He asserts that there were

11

two crime scene photographs of the victim's body introduced and four of his body at the time of the autopsy. He argues that the two crime scene photographs were especially gruesome because they were taken shortly after the victim's death and before the victim's body had been cleaned. He contests Trial Exhibit 15 as particularly "grotesque."

We first note that, pretrial, the trial court did a thorough job of reviewing the photographs offered by the State. It excluded the majority of the photographs. There are two photographs of the victim's body at the scene to which the Defendant appears to maintain his objection. Exhibit 13, depicts the victim's body as it was lying on his bed from the doorway of the room. His legs are primarily all that is visible and his face and head cannot be scene. This exhibit showed the couch upon which the Defendant said he sat during the shooting. The trial court reviewed multiple similar photographs and determined that Exhibit 13 would be admissible because:

> It is some distance from the body. It shows orientation of the room. . . . [I]t's not very close up, but it gives sort of a view of where the victim is at in the bedroom. So . . . I don't find it to be too prejudicial, under the probative value, of where the individual was inside the room would seem to be of importance to lay out the crime scene.

The trial court excluded the other, similar photographs.

Exhibit 15, shows the victim's body from a closer distance and the victim's face is included in the image. Multiple bullet wounds can be seen on his body, including one to his chin. There is blood on his body in various places, as well as stickers used by EMS to revive him. The State submitted that, while this photograph was taken from a closer distance, it showed all of the placards for pieces of evidence around the victim's body. Each of those pieces of evidence were relevant in the case, including the location of shell casings, projectile entries into the comforter, and a towel used to help the victim before his death. The State agreed not to introduce other similar photographs if the trial court allowed this photograph. The Defendant contended that this photograph would inflame the jury and that the probative value was outweighed by its prejudicial effect.

The trial court noted that the picture showed five evidence placards, unlike other pictures offered by the State of the victim's body. The trial court stated:

> [The photograph] shows the deceased laying in the middle of the bed, and there are evidence placards across it. It is the only photograph that has been tendered to the Court that shows this wide sort of angle, if you will, of all the evidence placards, with the exception of "9" that's cut off in the top corner.

12

The state is saying each one of these evidence placards are significant, whether they are shell casings, or a towel that was used, but they are things that would come into evidence and be testified to that are part of the crime, the crime scene that they are going to have individuals testify to. And I think that the probative value of shell casings, and things of this nature, is extremely high, and that probative value would outweigh any prejudicial effect and it substantially outweighs it. So that's going to come in.

Yes, there is some dried blood. It's not. . . I mean, any photograph, to some degree, any photograph in a homicide case that shows the deceased is going to have some prejudicial effect. I understand that. But in considering the nature of homicide cases in general, there doesn't appear to be any opened incredible wounds here, or any destroying of the body, or anything of that nature. They are, it looks like gunshot [wounds] from looking at them. They are small wounds with dried blood. And I don't find that the prejudicial effect of this is of such a degree and nature as to exclude it.

It excluded all other photographs of similar nature offered by the State.

The admissibility of authentic, relevant photographs, or a videotape of a crime scene or victim, is within the sound discretion of the trial judge, and the court's ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. *State v. Teague*, 645 S.W.2d 392, 397 (Tenn. 1983). To be admissible, a photograph or videotape must be relevant to some issue at trial, and its probative value must outweigh undue prejudicial effect. *State v. Lacy*, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[18] (4th ed. 2000). As stated above, "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

The Tennessee Supreme Court has held that photographs of a corpse are "admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Banks*, 564 S.W.2d at 950-51 (traditional rule in murder prosecutions is that photographs of the corpse are admissible, subject to Rule 403 balancing, if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character); *see also State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993) (crime scene videotape that depicted the victims' bodies as found was highly probative, admissible, and not cumulative when photographs of the victims were also admitted); *State*

13

*v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985) (photographs showing blood, a bloody trail, the victim's body as found, and a fatal throat wound were not gruesome and served to supplement and clarify oral testimony describing the crime scene).

We conclude that the trial court did not abuse its discretion when it determined that the probative value of the two admitted photographs, Exhibit 13 and Exhibit 15, outweighed any unfairly prejudicial effect. As the trial court found, Exhibit 13, was relevant to show the layout of the victim's room. It depicted the couch upon which the Defendant sat between firing rounds at the victim. Similarly, Exhibit 15, while including the victim's body, also depicted multiple evidence placards about which multiple witnesses would testify. These placards indicated where shell casings were found, where there were bullet holes in the comforter, and a towel used to aid the victim. Accordingly, we conclude that the trial court did not err when it admitted the crime scene photographs that included the victim's body.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

14